In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00032-CV**
_____

**IN THE INTEREST OF A.T.M., L.C.M, and J.M.M.**

**On Appeal from the 410th District Court**
**Montgomery County, Texas**
**Trial Cause No. 15-01-00518-CV**

**MEMORANDUM OPINION**

Father appeals the trial court's order in this suit to modify the parent-child relationship with his three minor children, A.T.M., L.C.M., and J.M.M.[1] In three issues, Father asks: (1) whether the trial judge's conduct and comments during trial denied Father his right to a fair trial before an impartial judge; (2) whether the trial court abused its discretion by failing to recuse itself from hearing Father's motion for new trial; and (3) whether the trial court abused its discretion by failing to confer

---

[1] In order to protect the privacy rights of the parties involved in this suit to modify the parent-child relationship, we identify the children by their initials and other individuals by pseudonyms. *See* Tex. Fam. Code Ann. § 109.002(d).

1

with one of the children, A.T.M., then 12 years of age, pursuant to Texas Family Code section 153.009(a). After careful consideration of each issue, we affirm the trial court's modification order.

## I. Background

### A. Procedural History

Father and Mother divorced on March 17, 2015. Three children were born of the marriage, A.T.M., L.C.M., and J.M.M. In August of 2016, Mother filed suit to modify the parent-child relationship, and the trial judge ultimately signed an agreed order between the parties on December 13, 2016. In 2017, the parties began having difficulties communicating.

In July of 2017, Father sought to modify a prior child support order, followed by a request for emergency temporary orders filed in August of 2017 after A.T.M. reported inappropriate conduct by Mother's fiancé, Trevor. The conduct that A.T.M. reported included Trevor walking around Mother's home naked, revealing his genitals in the presence of the children, and playing inappropriate games with the children. A trial judge entered an ex parte restraining order which prohibited Trevor from being in the children's presence. Following a hearing, the trial judge entered a temporary order appointing Father and Mother joint managing conservators with Mother having the right to designate the children's primary residence during the pendency of the case but prohibiting Trevor from being in the home while the

2

children were present, and requiring a custody evaluation, among other things. The trial court later entered an agreed order appointing a custody evaluator.

Mother filed a counterpetition seeking sole managing conservatorship. In an amended petition, Father requested that he be appointed as the person to designate the children's primary residence, or in the alternative, that he be appointed joint managing conservator with an expanded standard possession order, along with reimbursement for overpayment of child support.

Both parents filed motions requesting that the judge confer with the children "to determine the children's wishes" as to custody and conservatorship.[2] They each requested that the record of the interview be made part of a record in the case.

**B. Trial Proceedings**

A visiting judge presided over the bench trial. The parties stipulated to a geographic restriction for purposes of designating the children's residence and to a permanent injunction prohibiting Trevor from being in the home while the children

---

[2] Father also filed an emergency motion for the judge to confer immediately with the children shortly after the hearing on the temporary orders and over a year before trial. In his emergency motion to confer, Father complained that A.T.M. reported Mother may have been discussing matters with the children in violation of the temporary orders and sought to have the court determine whether the children were endangered and if further orders were "necessary to protect the children during the pendency of this case." There is nothing in the record to indicate the judge ever conferred with the children on an emergent basis.

were present.[3] The only issues remaining for the trial court to determine were possession, access, communication, and a co-parenting coordinator.

**1. Testimony of Dr. Lesley Compton**

The first witness to testify at trial was Dr. Lesley Compton, a licensed psychologist and the children's counselor. In 2017, Father first contacted her about A.T.M., who began having difficulty getting along with his siblings and friends. Dr. Compton observed that the children experienced conflicts when dealing with divorce issues in the separate households and outlined some of the differences the children reported in the homes.

In July 2017, A.T.M. reported for the first time that Trevor sometimes walked around the house naked and would expose his genitals outside of his pants which Dr. Compton described as "unusual" and "inappropriate behavior." She consulted with another psychologist, and they concluded that while inappropriate, Trevor's behavior did not rise to the level of being abusive at that time and did not necessitate that they call CPS. The boys reported that Mother suggested to Trevor that he stop, but he disregarded Mother's rules.

---

[3] While there was extensive testimony regarding Trevor's inappropriate conduct, because Mother stipulated to a permanent injunction prohibiting him from being around the children, we only discuss the portions of this testimony necessary for an understanding of the remaining issues between the parties and what gave rise to the modification proceeding.

Dr. Compton testified that A.T.M. had difficulties transitioning between his parents' homes. Dr. Compton also described issues A.T.M. had with his Mother involving phone calls, questioning why he did not want to come to her house, and what he perceived as Mother's disparate treatment between him and his brothers.

Dr. Compton provided testimony regarding the parents' significant others. A.T.M. reported that if he had a problem at Father's house, he felt he could speak with Sandra, Father's girlfriend, but A.T.M. did not feel the same about Mother. Dr. Compton described the children's relationship with Sandra as "a good relationship." Dr. Compton testified that by the end of September, Trevor "was not in the picture," but A.T.M. continued to express concerns about Mother's relationship with him. A.T.M. also questioned why Mother did not believe him and his siblings and why she "chooses [Trevor] over us." Dr. Compton testified that based on A.T.M.'s comments, A.T.M. felt there was a rift between himself and Mother.

Dr. Compton testified that A.T.M. preferred to spend more time at Father's house, but he felt guilty about that. He asked Dr. Compton how old he had to be to choose which parent he wanted to live with and expressed his preference to live with Father and visit Mother on special occasions.

Dr. Compton testified that the children were "in good emotional health." She said A.T.M., as the oldest, is more sensitive, has a "little bit of anxiety[,]" and wants to make both parents happy. Dr. Compton described instances of medical treatment

5

that the parents disagreed on for the children. Dr. Compton diagnosed A.T.M. "with an adjustment disorder with depressed mood."

Dr. Compton was familiar with the concept of alienation and acknowledged that if a parent was doing that, it was not healthy. She agreed that it could result in the loss of a proper parent-child relationship and that if Father told the children not to text Mother or blocked phone calls, that would be inappropriate alienating behavior on the Father's part. She explained that alienating behavior creates division in a family and could cause a child to have an emotional reaction.

Dr. Compton said that Mother's structured routine around bedtimes and eating meals together was good for the children. Dr. Compton testified that the children need both parents to support them and work together but Mother and Father do not do this, and "that's the huge issue." Dr. Compton did not see any evidence that Mother and Father are able to co-parent and felt co-parenting counseling would benefit both parents.

### 2. Testimony of Dr. Kit Harrison, Custody Evaluator

Dr. Kit Harrison, the custody evaluator, also testified. As part of his evaluation, Dr. Harrison interviewed the children, both parents, the parents' significant others, grandparents, and Trevor's mother. Dr. Harrison found there was some evidence of abuse by Trevor, but he did not find abuse in the home and understood Trevor was no longer in the home. He testified there was "cause to be

6

concerned about the living arrangements in mom's home[,]" but "at the very end of [the] evaluation, those were about to be remedied."

He also spoke with Dr. Compton and reviewed her records. Dr. Harrison explained that while he found Dr. Compton "to be fairly neutral[,]" Mother "always perceived the therapist as being aligned against her" and advised both attorneys that it was "preferable that they had someone that both parties selected."

Dr. Harrison testified that Father was not an active Father until sometime in 2016 and explained that Father wanted to be the father he never had, which he described as a "reaction formation." Dr. Harrison described Father as "attentive[,] . . . playful[,] . . . boyish[,] . . . permissive, and he has anxiety when it's time to crack down." He also explained that Father felt Mother focused her efforts toward her relationship with Trevor at the expense of the kids, whereas Mother believed Father's behavior was an attempt to alienate the children from her because of her life changes.

Dr. Harrison confirmed that in July 2017, A.T.M. and L.C.M. reported to Father that Trevor struck them in the genitals. Dr. Harrison indicated Father became angry and contacted CPS and the sheriff's department, which was a reasonable response. He testified that Mother minimized Trevor's conduct and tended to deny it happened, but she was also a victim of Trevor's deception. Dr. Harrison agreed that a conflict developed between the older two boys regarding Mother's relationship

7

with Trevor, which he characterized as "a normal feeling in a blended family." Dr. Harrison explained there was a "confluence of those issues on top of the inappropriate behavior from [Trevor.]"

Dr. Harrison testified that A.T.M. wanted to live with Father. He also agreed that Father "unintentionally" was an alienator and exercised "some undue influence" of A.T.M. Dr. Harrison felt the rift between A.T.M., L.C.M. and Mother is Father's responsibility, as well as Mother's. Dr. Harrison testified positively about Sandra, Father's girlfriend, and described her as a "stabilizing influence."

Dr. Harrison indicated that blocking the children's phones at the carrier level, such that Mother could not reach the children even when they were in her possession, would be "[h]ighly inappropriate." Dr. Harrison was not surprised that the relationship between Mother and A.T.M. wavered since the phones were blocked; she could not call or text the children nor could they contact her, but Father had unfettered access. He agreed that Father "caused or participated" in a lot of the problem. Dr. Harrison explained that a parent must not use conservatorship powers and access to a child to interfere with that child's relationship with the other parent, and Father doing so "was a mistake." By helping A.T.M. prevent Mother from looking at his phone, Father helped align A.T.M. with himself, and A.T.M. "sees a powerful ally" in Father.

Dr. Harrison described A.T.M. as "a ball of anxiety about [Father]" and explained that A.T.M. was very insecure in his attachment with Father, because in the past, Father was not there for him. Dr. Harrison testified that A.T.M. and Father are trying to make up for it now and described these attempts as "inartful," suggesting that the only way to form a secure attachment in an older child like A.T.M. is to become "predictable." Dr. Harrison testified that Father "reacts to situations" and agreed this included cutting off cell phones, blocking Mother, and sending nasty emails.

Dr. Harrison testified that the kids are "extremely attached" to Mother, but she also reacts to environmental circumstances and panicked when A.T.M. started pulling back from the relationship. He also testified that A.T.M.'s mood deteriorated as he became more adamant about not spending time with Mother. He testified that A.T.M. was secure in his attachment with Mother and knew she would be there, but A.T.M. was worried about Father. He agreed that Father instructing the children not to speak to Mother was potentially alienating behavior but disagreed that Father was evilly motivated to segregate the kids from Mother. However, Dr. Harrison testified that Father tried "to increase his bond and attachment with the kids and decrease their bond with Mom." Father had a rule that the kids could not call or text Mother, which he described as "a bad idea."

Dr. Harrison agreed that Mother was emotionally reluctant to be around Father due to abusive emails he sent to her and to third parties, including her employer. He stated these emails to third parties was part of Father's "exhilaration of reentering the kids' lives and the righteous indignation that goes therewith." Dr. Harrison testified that in custody cases, "you don't mess with . . . your ex-spouse's employment[,]" because "it's in everyone's best interest for each parent to be gainfully employed."

He testified that the parties should remain joint managing conservators. Dr. Harrison ultimately recommended that the children continue having primary residence with Mother and have liberal visitation with an expanded possession order for Father. Dr. Harrison testified that if Mother was to retain this right, there should be a permanent injunction preventing Trevor from being in the home when the children are present, to which Mother stipulated. Dr. Harrison testified that both parents had strengths that would include them as being managing conservators and both have weaknesses that in some ways would disqualify them; he felt "either could do the job." He testified that conflict was the problem for the children, not the lack of co-parenting—naming someone sole managing conservator was not a good idea and would not eliminate the conflict in this case. Dr. Harrison also confirmed that both parents "indisputably" loved the children. Dr. Harrison explained that the reason he recommended Mother remain as primary conservator was due to her

10

history of caretaking, and he focused on J.M.M. as the "neediest of the children" who should be with his mother, which tipped the scale. Dr. Harrison testified that neither Mother nor Father co-parent very well and he did not see that they could do so soon without further assistance, which necessitated a parenting coordinator.

Dr. Harrison testified that Father "absolutely" engages in alienating behavior, and Mother gets desperate, but Dr. Harrison did not see that Father had an "evil motive." He confirmed that the outcry about Trevor is what instigated the custody litigation "for the most part," but added there were financial issues as well. Dr. Harrison also felt that Trevor "was playing" Mother and not engaging in behavior she would observe directly.

### 3. Trial Judge's Comments

There are several specific comments by the trial judge that warrant a background discussion as Father complains of them on appeal. In the first exchange, Mother's counsel noted that the trial judge was "one of the first people to hold my firstborn son when I was walking around in court[,]" and "we all go way back[.]" Father contends the "relationship could reasonably be viewed by the public as one wherein the judge would be willing to treat the attorney with more favoritism than she would an attorney who did not have such extensive contact."

The second complained-of comment involved a discussion regarding the potential future scenario that the children may desire tattoos and a recommendation

11

by the custody evaluator that both parents must provide written consent, which they agreed to. During this discussion, the following exchange took place:

> THE COURT: Could we get [Father] a pair of gloves? He needs some gloves.
>
> FATHER'S COUNSEL: Judge, that is highly fashionable these days.
>
> THE COURT: Oh, I know it.

Father argues that his hands are tattooed, and the judge's comments show a prejudice against him because of that.

Lastly, he complains that his attorney and the trial judge repeatedly asked him if he would agree to allow the trial court to rule and waive his opportunity to present more evidence. After Dr. Compton and Dr. Harrison testified, the trial judge indicated she was prepared to rule. Father took the stand, and his attorney advised him that he had the right to put on additional evidence, including "the right to insist that the Court interview these children in chambers[,]" which Father indicated he understood. At that point, Father's counsel recommended that Father allow the trial judge to rule. Initially, Father expressed some confusion about whether he would be agreeing to the actual ruling or simply agreeing that the judge could make a ruling without additional evidence. Following a lengthy discussion and a recess, which allowed Father the opportunity to consult and confer with counsel, Father agreed on the record to waive putting on additional evidence and agreed the judge could rule.

12

The pertinent portion of this exchange follows:

> Q. (COUNSEL) And, [Father], earlier I asked you some questions about whether you wanted to -- or whether you insist on putting on more evidence before the Court concerning this case. Do you remember that?
>
> A. Yes.
>
> THE COURT. I'm asking for Tracy's gun.
>
> Q. (COUNSEL) Okay. You were asked if it was okay -- if the Judge could make a ruling now and you waived putting on any further evidence in this case? And that would be contingent, of course, on --
>
> A. Yes.
>
> Q. -- [Mother] asking the Court to do the same thing.
>
> A. Yes.
>
> Q. Are you okay with this?
>
> A. Yes.
>
> Q. Are you saying it's okay right now for the Court to rule in this case?
>
> A. Yes.

Father argues that he was confused, did not understand what he was agreeing to, and only after the trial judge asked the bailiff for his gun did he agree to waive putting on any other evidence. Mother also agreed to allow the trial judge to rule without putting on any additional evidence.

13

**4. Trial Court's Ruling and Order**

The modification order provided that (1) Father and Mother would remain joint managing conservators, (2) Mother would have the right to designate the children's primary residence within a restricted geographic area, and (3) Father would have expanded possession. Following entry of the modification order, Father filed a motion for new trial and a motion to recuse based on certain comments the trial judge made during the trial and her long-standing friendship with Mother's attorney. The trial judge immediately referred the motion to recuse to the presiding judge for the administrative region. The presiding judge denied the motion to recuse. The motion for new trial was overruled by operation of law. Father timely appealed.

## II. Analysis

### A. Issue One: Trial Judge's Comments

In his first issue, Father argues that he was deprived of a fair trial by an unbiased judge and points to the trial judge's comments and friendship with Mother's attorney. We determine this issue has not been preserved for our review.

During the bench trial, Father was required to preserve his complaints about the trial judge's comments by objecting when the allegedly improper comments were made. *See* Tex. R. App. 33.1(a); *In re Estate of Parrimore*, No. 14-14-00820-CV, 2016 WL 750293, at *12 (Tex. App.—Houston [14th Dist.] Feb. 25, 2016, no pet.) (mem. op.) (holding that in a bench trial appellant was required to object to

14

improper comments when they were made); *see also Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001) (explaining that during jury trial appellant was required to object to improper comments when they were made). Father failed to object during the trial to these allegedly improper comments. Instead, he first raised the complaints almost thirty days after the judgment was signed in his motion to recuse and motion for new trial. This was not sufficient to preserve these complaints for our review. *See In re I.C.*, No. 02-15-00300-CV, 2016 WL 1394539, at *13 (Tex. App.—Fort Worth Apr. 7, 2016, no pet.) (mem. op.) (concluding that motion to recuse filed the day after the allegedly improper comments failed to preserve error). Because Father failed to contemporaneously object to these comments, he has failed to preserve this issue for our review. *See* Tex. R. App. P. 33.1(a).

**B. Issue Two: Motion to Recuse**

In his second issue, Father contends that the trial court abused its discretion by failing to recuse herself from hearing his motion for new trial, because her "impartiality might reasonably be questioned."[4] The trial judge referred the matter to the presiding judge, who denied the motion to recuse.

We review the denial of a motion to recuse for an abuse of discretion. *See* Tex. R. Civ. P. 18a(j)(1)(A); *Vickery v. Vickery*, 999 S.W.2d 342, 349 (Tex. 1999) (op.

---

[4] Because it is unclear from the briefing whether Appellant is complaining about the denial of the motion to recuse generally based on alleged impartiality or the trial judge's refusal to recuse herself and rather refer the matter, we address both.

on reh'g). This test is not whether the reviewing court believes the facts present an appropriate case for the trial court's action, but instead is a question of whether a trial court acted without reference to any guiding rules or principles. *Woodruff v. Wright*, 51 S.W.3d 727, 736 (Tex. App.—Texarkana 2001, pet. denied).

Upon receiving a motion to recuse, a trial judge has two choices: (1) they can sign an order of recusal; or (2) refer the motion to the regional presiding judge. *See* Tex. R. Civ. P. 18a(f)(1)(A)–(B). Here, the trial judge's referral of the motion to recuse to the regional presiding judge was expressly authorized by the Texas Rules of Civil Procedure. *See id.* Accordingly, the trial judge did not abuse her discretion by acting without reference to any guiding rules or principles when she refused to recuse herself and instead referred the matter to the regional presiding judge. *See id.*

We overrule Father's second issue.

**C. Issue Three: Motion to Confer Pursuant to 153.009(a)**

In his third issue, Father argues that the trial court abused its discretion by failing to confer with A.T.M. Specifically, Father contends that despite filing a motion to confer pursuant to Texas Family Code section 153.009(a), the trial court refused to do so. *See* Tex. Fam. Code Ann. § 153.009(a) (providing that upon request, the trial court shall interview in chambers a child twelve years of age or older regarding the child's wishes as to the person who shall have the right to designate the child's primary residence). Father argues that the trial court's failure

16

to interview A.T.M. constituted an abuse of discretion, because the child was older than twelve at the time of trial. In support of this contention, Father directs us to *In re McPeak*. 525 S.W.3d 310 (Tex. App.—Houston [14th Dist.] 2017, no pet.). In that case, the court determined that the trial judge's failure to confer with the child constituted an abuse of discretion. *See id.* at 315–16. However, in the present case, counsel apprised Father of his right to insist that the trial judge confer with the child on the record, yet Father agreed to allow the judge to rule without doing so. Father cannot now complain that the trial court ruled without conferring with the children nor has he shown any harm in its failure to do so. *See* Tex. R. App. 44.1(a). On the contrary, Father requested that he have the right to designate the children's residence, or in the alternative, that the parties continue as joint managing conservators with him receiving expanded possession. The trial court's order gave him the alternative relief he requested.

We overrule Father's third issue.

### III. Conclusion

We hold Father failed to preserve error by contemporaneously objecting to the trial court's comments. We further hold that the trial judge acted within her discretion by referring the motion to recuse to the presiding judge for the administrative region. Finally, we hold that the trial court did not abuse its discretion by not conferring with A.T.M. based on Father's knowing agreement on the record

to forego the submission of additional evidence and further failed to show how he was harmed by the trial judge's failure to confer with the child. We affirm the trial court's modification order.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on March 12, 2020
Opinion Delivered September 24, 2020

Before Kreger, Horton and Johnson, JJ.